UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM

UNITED STATES OF AMERICA

v.

ROBY DUDLEY
and
HANNIBAL PENNEY

_____/

NIGHT BOX
FILED

JAN 2 5 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## GOVERNMENT'S RESPONSE TO DEFENDANT PENNEY'S "SECOND MOTION IN LIMINE"(ADOPTED BY DEFENDANT DUDLEY) TO SUPPRESS RECORDINGS MADE BY THEIR EMPLOYER AND SEIZED PURSUANT TO A SEARCH WARRANT

The United States of America, by and through its undersigned Assistant United States Attorney, respectfully files this response to defendant Penney's "Second motion in limine" (adopted by defendant Dudley) to suppress recordings made by their former employer and seized by the FBI pursuant to a search warrant. In summary, the defendants incorrectly claim that Title III's prohibitions apply to the recordings made by their employer at Best Marketing, Inc. The defendants' motions make unfounded assertions of illegality; they omit important aspects of the facts and the law. For the reasons detailed below, the government respectfully requests that this Court deny the defendants' motion.

### BACKGROUND

Penney and Dudley made their living by calling people repeatedly and convincing them through deception to make large purchases again and again. Penney and Dudley, each in their own

1

way, were very good at deceiving people on the phone by what they said, how they said it, and what they did not say. In the telemarketing field, they were called "reloaders."

Among the places where Penny and Dudley worked as reloaders was Best Marketing, Inc. Best was engaged in fraudulent telemarketing from 1989 to July 1996. They sold advertising specialty items (such as imprinted pens, key tags, etc.) at highly inflated prices through fraudulent misrepresentations. The reloaders targeted small business owners all over the country. They used the calls to get to know their targets and to gain their trust. The reloaders then made misrepresentations to the victims such as telling them they had gained a special status such as "grand national finalist" or "businessman/woman of the year," and that if they made an additional purchase of advertising items, they had a significantly increased chance of winning an allegedly valuable "premium." Both Penney and Dudley frequently led the victims to believe that they had inside information that the victim would receive a premium much more valuable than what they would spend. Penny and Dudley deceived the victims using direct and implied promises, combined, literally, with an acting performance. The acting included, for example, Dudley's high-pitch excitement, and Penney's pretense that he was a senior officer of the business. However, contrary to what the defendants told the victims, the reloaders themselves chose the premiums they would send their customers. The premiums were calculated to somewhat please the customer, while being relatively low in value so that each sale (including the premium) would result in significant profit to both the reloader and Best Marketing.

Before joining Best Marketing in 1989, Dudley worked at American Marketing, which was involved in a similar advertising items scheme. Similarly, before joining Best Marketing in late 1995, Penney worked at Datron, which was also engaged in a similar advertising items scheme. In

2

this telemarketing industry, it was common practice for owners and supervisors to monitor the salespeople's phone conversations. This was done at American, at Datron, and at Best. It was common knowledge.

Best Marketing, like many businesses, had separate phone extensions that were assigned to employees. Ed Hexter, the owner of Best Marketing, his son, David Hexter, and supervisors could monitor salespeople's calls by punching in a particular salesperson's extension number.

The salespersons were aware of the monitoring. The less experienced salespeople (usually "fronters" who made the initial calls to customers) were trained based on what supervisors heard. More experienced sales people (usually loaders) were also monitored for supervision purposes. Ed Hexter would openly sit on the phone listening to loaders and at times also listened to the loaders on his speaker phone. Ed Hexter would make comments to the salespersons and at office meetings about conversations he overheard.

In the beginning of 1996, the number of salespeople grew at Best Marketing. Datron closed, and Hexter hired a number of the salespeople who worked there. Among them were defendants Penney and Martin (who has pled guilty and is cooperating). Around this time Ed Hexter began recording all the salespersons calls in addition to listening. Goldberg, another loader who has pled guilty and is cooperating, saw the recording equipment and asked not to be recorded. Hexter did not agree. Goldberg told Dudley about Hexter's recording. The word got around the salespersons about the recording. Hexter continued to listen and record the calls at Best Marketing. The tapes made by Hexter were seized by the FBI when it executed a search warrant at Best Marketing on July 17, 1996.

3

While it is clear that Penny and Dudley are only moving to suppress the tapes made by Hexter of their telephone calls, Penney's motion makes inaccurate references to other tapes in this case. (Defendant's motion at page 2 and footnote 2.) Penny's motion incorrectly suggests that Best Marketing used the tapes of the loaders to "deflect inquiries." This is hardly likely as there are blatant lies on those tapes. Because of Penney's inaccurate reference, it is necessary to include a mention of the other tapes involved in this case.

Best Marketing employees made other recordings (called "verification tapes") which were also seized when the FBI executed the search warrant. These are the recordings that would be used when complaints were addressed to Best Marketing, as mentioned in Penney's motion.

The verification tapes were made after loaders like Penney and Dudley convinced a customer to make an additional purchase. A different Best employee would call the customer to purportedly to confirm the "copy" or the exact wording that was to be printed on the advertising items. With the consent of the customers, Best taped these calls. In addition to going over the ad copy, the caller would repeat the possible premiums that the customer could get, and get the customer to at least passively agree that they did not get a different understanding from the salesperson. In anticipation of this verification call, Dudley would suggest to his customers that he had inside information, or that he had gone an extra step for that customer, which could not be revealed to the employee making the verification call. Penney would similarly suggest to his customers to make the verification call go smoothly. At times Penney and Dudley also had to speak to customers again if they had trouble making it through the verification call.

In addition to the tapes made by Best Marketing, several tapes were made during the law enforcement investigations of the fraud. Consensual recordings of calls with loaders were made by

4

victims of Best Marketing, by undercover investigators, and by an FBI informant who was went to work at Best in an undercover capacity.

## TITLE III DOES NOT REQUIRE SUPPRESSION OF THE EMPLOYER'S TAPES[1]

### I. Title III does not generally apply to the monitoring of business phone extensions

Title III prohibits the interception of certain communications. The statute specifies what is covered and what is not covered by its prohibitions. At the outset of the statutory provisions, the statute specifies that it does not apply to the monitoring of business phone extensions used in the ordinary course of business.

More specifically, such monitoring is not an "interception" as defined by the statute. According to 18 U.S.C. §2510(4), "'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device." A business phone extension is not an "electronic, mechanical or other device" as further defined by the statute. Section 2510(5) states:

> "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or other electronic communication other than –
>
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being

---

[1] Based on the papers alone, the defendants have not met their preliminary burden of establishing standing to move to suppress specific tapes. Unsworn assertions by an attorney are insufficient. There must be sworn evidence by someone with personal knowledge. United States v. Bellomo, 954 F. Supp. 630, 639 (S.D.N.Y. 1997); United States v. Montoya-Eschevarria, 892 F. Supp. 104, 106 n.1 (S.D.N.Y. 1995). One of the deceptive techniques used by the defendants was using different names and voices. For example, sometimes Dudley went by Ted Brown; other times by Ed White. Penney went by Dr. St. James, Dr. Maxwell, and Lincoln Green. To establish standing, the defendants must themselves offer sworn evidence that their voice is on the specific tapes they seek to suppress. United States v. Fury, 554 F.2d 522, 525 (2d Cir. 1977).

used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business . . . .

The "telephone extension exception" or the "business extension exemption" is well established in case law.[2] Royal Health Care Services, Inc. v. Jefferson-Pilot Life Ins., 924 F.2d 215 (11th Cir. 1991); Epps v. St. Mary's Hosp. of Athens, 802 F.2d 412 (11th Cir. 1986); Watkins v. L.M. Berry & Company, 704 F.2d 577 (11th Cir. 1983); Briggs v. American Air Filter Co., 630 F.2d 414 (5th Cir. 1980). In Epps v. St. Mary's Hosp. of Athens, 802 F.2d 412 (11th Cir. 1986), the hospital had a tape recorder attached to the dispatch console into which emergency calls were made and from which emergency medical technicians were notified. Two employees were recorded by a third employee when the employees were making disparaging remarks about their supervisor. They were speaking on a line that connected their technician station with the dispatch office. The employees sued their employer under Title III. The Eleventh Circuit affirmed the grant of summary judgment in favor of the hospital.

The Eleventh Circuit ruled that recording was not an "interception" under Title III, because it came under the "extension phone exception" of sections 2510(4) and (5), quoted above. St. Mary's Hosp., 802 F.2d at 415. In addition, the Eleventh Circuit explained that it was the console that intercepted the call, not the recorder. Id.; accord, Royal Health, 924 F.2d at 217. The Eleventh Circuit in St. Mary's Hosp. also followed its own precedents in repeating that the monitoring of business calls is considered to be "in the ordinary course of business." St. Mary's Hosp., 802 F.2d

---

[2] In specific cases in the Title III area in general, however, the courts of appeals from the various federal circuits differ on a number of issues.

6

at 416-17 (citing Watkins v. L.M. Berry & Company, 704 F.2d 577 (11th Cir. 1983), and Briggs v. American Air Filter Co., 630 F.2d 414 (5th Cir. 1980)).

Similarly, in Royal Health, the Eleventh Circuit affirmed summary judgment in a lawsuit claiming a violation of Florida law.  The Court noted that the language of the Florida business extension exception is identical to the language of the business extension in the federal Act.  Royal Health, 924 F.2d at 219.

In Royal Health, a JP Life employee who was in North Carolina called Royal Health's Miami, Florida office.  The conversation was recorded pursuant to a JP Life policy that all outgoing calls from its case management department be automatically recorded.  The Royal Health employee was not told of the recording.  The call concerned a bill submitted to JP Life.  Reaffirming St. Mary's application of the federal business extension exception, the Eleventh Circuit again ruled that it was the extension, not the recorder that intercepted the call, and that the call was intercepted in the ordinary course of business.  Id. at 217-18.

Knowledge or consent is not required. Royal Health, 924 F.2d at 219; St. Mary's Hosp., 802 F.2d at 413-414, 417; Watkins, 704 F.2d at 582; Briggs, 630 F.2d at 419-20.  Another provision of Title III, 18 U.S.C. §2511(d), provides that interceptions are generally not unlawful under the Act if one of the parties to the communication has consented to the interception.  (This exception is discussed below, and also applies in this case.)  The courts have recognized that to require consent under the business extension exception would make that exception superfluous.  To be exempt from Title III, it is sufficient that the monitoring of the extension be done in the ordinary course of business.  E.g Watkins, 704 F.2d at 582 (monitoring of sales calls to review sales techniques was in the ordinary course of business); Briggs, 630 F.2d at 416, 419-20 (business extension exemption

7

applied when supervisor of a salesman listened and recorded from an extension phone without the

salesman's knowledge because the supervisor was concerned that the salesman was having improper

communications with a competitor).

In this case, the owner and supervisors of Best Marketing monitored the calls made by

salespersons to customers. The listening, and later the recording, was done using a business phone

extension in the ordinary course of business for training and supervision. As in the Eleventh Circuit

cases cited above, there was no Title III "interception" in this case.

## II. Monitoring with the consent of one party is generally lawful under Title III

In addition to being exempted from Title III under the business extension exemption, the

monitoring in this case was lawful under a different provision of Title III. It is generally lawful

under Title III to monitor a phone call with the consent of one of the parties to the conversation.

Title 18 U.S.C. §2511(d) provides:

> It shall not be unlawful under this chapter for a person not acting under color of law
> to intercept a wire, oral, or electronic communication where such person is a party
> to the communication or where one of the parties to the communication has given
> prior consent to such interception unless such communication is intercepted for the
> purpose of committing any criminal or tortious act in violation of the Constitution or
> laws of the United States or of any State.

In this case, both Penney and Dudley consented to the monitoring of their sales calls by the

owner and supervisors at Best Marketing. Their consent can be implied from their full knowledge

of the actual monitoring in the telemarketing industry, at Best in particular, and their continued calls

on the monitored lines. See Watkins, 704 F.2d at 581-582 (the scope of consent can be implied from

the facts of each case); United States v. Noriega, 764 F. Supp. 1480, 1491 (S.D. Fla. 1991)(prisoner

impliedly consented to the taping of calls when he deliberately used prison phone that he was aware

was monitored, distinguishing <u>Watkins</u> in which there was an issue for the trier of fact as to whether an employee's consent extended to personal calls).[3]

In this case, both Penny and Dudley previously worked in similar telemarketing businesses that also monitored sales calls. At Best, the calls were openly listened to, sometimes even using a speaker phone. Also, feedback was given to the salespersons, sometimes personally and sometimes at staff meetings.

Moreover, in this case Dudley was personally told that Hexter had started recording, and the word got out to the other salespersons. They all continued to use the phone in the same way as before, and Hexter continued to give feedback the same way as before. In any event, under Eleventh Circuit law the interception is done by the phone extension, not the recorder.

If Penney and Dudley were to claim that the monitoring was done for some tortious or criminal purpose (so that the private consent exception would not apply), it would be the defendants' burden to prove it by a preponderance of the evidence. <u>United States v. Zarnes</u>, 33 F.3d 1454, 1469 (7th Cir. 1994) (husband/wife in drug conspiracy); <u>United States v. Dale</u>, 991 F.2d 819, 841 (D.C. Cir. 1993), <u>cert.denied</u>, 510 U.S. 1030 (1993) (fraud participants). The fact that the contents of the tapes show telemarketing fraud would not make any difference, as the courts have found many non-criminal reasons for taping calls with criminal content. <u>See</u> <u>Zarnes</u>, 33 F.3d at 1469; <u>Dale</u>, 991 F.2d at 841. The defendants have not met this burden. The monitoring of their sales calls with their consent was lawful under Title III.

---

[3] In <u>United States v. Underhill</u>, 813 F.2d 105, 111-12 (6th Cir.), <u>cert.denied</u>, 482 U.S. 906 (1987), the court suggests that coconspirators in a gambling operation were bound by the acts of coconspirators who made tapes, and coconspirators may have waived their right of privacy in communications made in furtherance of the conspiracy.

**III.  Tapes should not be suppressed in any event when the government has "clean hands"**

Title III was not violated in this case.  Title III does not apply to the monitoring of business extensions in the ordinary course of business.  In addition, a separate provision states that monitoring is generally not unlawful when one party consents to the interception.

Although the court should not need to reach this issue, the government has "clean hands," and Congress did not contemplate the suppression of tapes in a circumstance such as this.  Although the provisions of Title III are worded broadly,[4] the Supreme Court, the Eleventh Circuit (and its predecessor Circuit, the Fifth Circuit) have ruled that the provisions of Title III have limits on their application.  For example, in Bartnicki v. Vopper, 121 S. Ct. 1753 (2001), the Supreme Court limited the application of another broadly worded provision of Title III that prohibits the intentional disclosure of a communication knowing that the communication was intercepted in violation of Title III.[5]  The Court held that the First Amendment protects the knowing disclosure of illegally intercepted communications if the communications deal with a matter of public concern and the person making the disclosure played no part in the illegal interception and lawfully obtained access to the communications.

---

[4] For example, 18 U.S.C. §2515 states: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

[5] 18 U.S.C. §2511(1)(c) makes it a crime for any person to "intentionally disclose[] . . . the contents of any wire . . . communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."

In spite of the broad language in the exclusionary clause of Title III, the Eleventh Circuit has applied the good faith exception to Title III. U.S. v. Malekzadeh, 855 F.2d 1492 (11th Cir 1988), cert. denied, 489 U.S. 1029 (1989). In Malekzadeh, the Eleventh Circuit noted that like in Fourth Amendment cases, it would in no way deter misconduct to suppress the fruits of a government wiretap due to the fact that some of the information in the application was based on a 1980 search warrant that was later claimed to be constitutionally infirm. Id. at 1496-97.

Additionally, many courts have recognized that despite the broad language in Title III, evidence obtained in violation of Title III may be used in judicial proceedings for impeachment purposes, for the end of preserving truth. See Forsyth v. Barr, 19 F.3d 1527, 1541 (5th Cir. 1994), cert. denied, 513 U.S. 871 (1994)(citing other circuits, and also binding 11th Circuit precedent, United States v. Caron, 474 F.2d 506, 508-10 (5th Cir. 1973)).

Furthermore, in Forsyth the court rejected the contention that illegally intercepted information cannot be used for any purpose whatsoever, noting among other things that section 2515 was poorly drafted. Forsyth, 19 F.3d at 1539 and n.25. The court held that when a police department had not participated in an illegal private interception, it was permissible to use the information in conducting an internal affairs investigation. Id. at 1545.[6]

Although, the Eleventh Circuit has not ruled on a criminal case presenting a private Title III violation, the United States would urge the Court to follow the ruling of the Sixth Circuit which has declined to suppress such evidence, when the government was not responsible for the private parties's violation. See U.S. v. Murdock, 63 F.3d 1391 (6th Cir. 1995); U.S. v. Underhill, 813 F.2d

---

[6] But see Chandler v. U.S. Army, 125 F.3d 1296 (9th Cir. 1987). In a civil case, the court held that the army could not use a tape made by the captain's wife in an adverse action against the captain.

11

105, 111-12 (6th Cir.), cert.denied, 482 U.S. 906 (1987).[7] In Murdock, the court found that a tape

made by the defendant's wife was made in violation of Title III; nonetheless, the court did not

suppress the tape in a criminal prosecution in which the government had "clean hands." The court

noted that such factual scenarios were not contemplated Title III, and that the legislative history

noted that section 2515 was not intended "generally to press the scope of the suppression role beyond

present search and seizure law." Murdock, 63 F.3d at 1402 (quoting S.Rep.No.1097, 90[th] Cong., 2d

Sess., 96 (1968)).

> The Court explained:

>> . . . the legislative history of Title III leads us to the conclusion that while privacy
>> was a major goal of the legislation, it was privacy in a particular context, namely, that
>> an individual who is the victim of an unlawful interception is entitled to protection
>> in court proceedings from any attempt by the *perpetrator* to use the interception
>> against the victim or in any way to benefit from the information which was either
>> contained in, or was the fruit of, the unlawful interception. . . . There is nothing in the
>> legislative history which requires that the government be precluded from using
>> evidence that literally falls into its hands.

Id. (emphasis in original). The Sixth Circuit distinguished the First Circuit's ruling in United States

v. Vest, 813 F.2d 477 (1st Cir. 1987), noting that the First Circuit had relied on cases in which the

government itself was alleged to have engaged in illegal interception or procedures. In Murdock,

the Court ruled that where the government played no part in the unlawful interception, a clean hands

exception applied, and the tapes would not be suppressed. Any privacy interest which the defendant

may have had is protected solely by the right to bring a civil action. Murdock, 63 F.3d at 1404.

Similarly, in United States v. Underhill, 813 F.2d 105, 111-12 (6th Cir.), cert.denied, 482 U.S. 906

(1987), the court declined to suppress tapes of bets found during a search.

---

[7] But see United States v. Vest, 813 F.2d 477 (1st Cir. 1987); In re Grand Jury, 111 F.3d
1066 (3rd Cir. 1997).

In this case, as stated above, there was no Title III violation. However, even if there had been, the government was not involved. The government obtained the tapes made by the employer when it executed a search warrant at Best Marketing. To suppress the tapes in this case would deprive the government and the jury of significant evidence, while providing no balancing benefit such as deterrence. In a case such as this, if a private violation took place, a possible civil action would be the remedy against the perpetrator of the alleged unlawful interception. [8]

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny the defendants' motions to suppress the tapes made by their employer at Best Marketing.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY
FLORIDA BAR NO. 0735167
99 N.E. 4th Street
Miami, Florida 33132
Tel: (305) 961-9431
Fax: (305) 530-6168

---

[8] In this case, the government is not aware of any civil action having been filed by the defendants who now seek suppression. As mentioned above, they were always aware of the monitoring, and also became aware of the taping. They have had attorneys representing them in this matter since at least early 2000. Ed Hexter died in October 2000 after having signed a plea agreement.

13

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 28th day of

January, 2002 to: Bill Norris, Esq., 7685 S.W. 104th St., Suite 220, Miami, FL 33156, and Albert

Levin, Esq., 888 Brickell Ave., Sixth Floor, Miami, FL 33131.

ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY

14