UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.: 00-6270-CR-GRAHAM



UNITED STATES OF AMERICA,

    Plaintiff,

vs.

HANNIBAL PENNEY and
ROBY DUDLEY,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant Hannibal Penney's Second Motion In Limine to Suppress Illegal Wire Interceptions and Their Fruits (D.E. 110).[1]

**THE COURT** has considered the motion, the evidence and argument presented at the motions hearing, the pertinent portions of the record, and is otherwise fully advised in the premises.

### I. BACKGROUND

The indictment alleges that Defendants Hannibal Penney and Roby Dudley, former telephone sales employees of Best Marketing, Inc. ("Best Marketing"), conspired to defraud customers by making false representations by means of interstate wire communications facilities.

---

[1] Co-Defendant Roby Dudley has moved to adopt Hannibal Penney's Motion In Limine (D.E. 113).



Ed Hexter, the founder and owner of Best Marketing, recorded daily telephone conversations made through the telephone system at his place of business. On July 17, 1996, pursuant to a search warrant, the government seized many recordings at Best Marketing's premises. The government seeks to introduce certain of these recordings at trial, over the Defendants' objections.

At the evidentiary hearing on the motion, Robert Eckland, of Global Communications, Inc., a telecommunications company, testified that he installed and serviced a business telephone system at the offices of Best Marketing. As part of that system, Mr. Eckland set up telephone extensions, through which employees of Best Marketing made telephone calls, including "sales pitches" to customers and potential customers.

As part of Best Marketing's business telephone system, Mr. Eckland also set up a "Service Observation Unit," a monitoring system which enabled Ed Hexter to monitor and listen to telephone conversations made through Best Marketing's telephone extensions. The service observation monitoring unit was connected to the telephone extensions in the mainframe console, or "phone closet." Mr. Eckland testified that in order to monitor and listen in on conversations, Mr. Hexter would dial a particular code on a box installed in Mr. Hexter's office, which would give him access to monitor particular telephone extensions, either through a single line telephone or a speaker phone also installed in his office.

Mr. Eckland testified that the type of telephone system he installed at Best Marketing is common to business applications.

Jeffrey Porter, an employee of Global Communications, Inc. and employee of Best Marketing at the time of the installation, also testified that he serviced the business telephone system at Best Marketing. Mr. Porter testified that he installed a recording device at Best Marketing, known as the "Call Logger," which recorded up to twenty telephone extensions at the same time. The Call Logger date and time-stamped those recordings, allowing a person to "zoom in" on any recording made at any particular time. Mr. Porter testified that he connected the Call Logger to the extensions in the mainframe console or "phone closet."

Several other witnesses testified that as a general matter, the telephone salespersons at Best Marketing were aware that Mr. Hexter monitored telephone calls, and that Ed Hexter would use the monitoring as a way to train and supervise his employees, or to suggest modifications to their "sales pitches." While it appears that the monitoring of telephone calls was well-known to sales people at Best Marketing, the salespersons and staff, including Defendants Penney and Dudley, were not aware that their telephone calls were being recorded, and it does not appear that either Defendant expressly consented to those recordings.

### III. DISCUSSION

Defendants seek to suppress certain taped recordings pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§2510-2521 et seq., the federal anti-wiretap statute. Defendants argue that Ed Hexter's recordings were illegally made in violation of Title III and should not be received into evidence at trial.[2]

The government, however, offers three theories to support its position that Title III was not violated. First, the government argues that the recordings fall within a statutory exception for interceptions made by businesses in the ordinary course of business, known as the business "telephone extension exception." Second, the government contends, at least as to Defendant Roby Dudley, that Defendant Dudley impliedly consented to the recordings. Third, the government maintains that this Court should recognize a "clean hands" exception under Title III, as the government itself did not participate in making any of the recordings alleged to violate Title III.

---

[2] Under 18 U.S.C. §2515, whenever any wire has been intercepted in violation of Title III, it cannot be "received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of [Title III]." See 18 U.S.C. §2515.

A.  <u>Standing</u>

As a threshold matter, the government argues that neither Defendant has standing to challenge the recorded evidence, on the ground that neither Defendant has admitted that their conversations were recorded on the challenged tapes. Defendants, on the other hand, argue that they need not confirm or admit that their voices appear on the taped recordings. Defendants submit that it is sufficient that the government has alleged that Defendants' voices appear on the recordings, and will seek to introduce those recordings at trial on that basis. For purposes of this analysis, the Court is satisfied that Defendants have standing to challenge the introduction of the recorded evidence.

B.  <u>Whether Ed Hexter's Recordings Violated Title III</u>

In order to establish that an intercepted wire communication violates Title III, the aggrieved party must demonstrate that (1) the conversations were "wire communications;" (2) the communications were "intercepted" within the meaning of Title III; and (3) the interceptions do not fall within a statutory exception for certain business telephone interceptions.

1.  <u>Were the conversations "wire communications?"</u>

Title III defines "wire communication" as follows:

> [A]ny aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce....

18 U.S.C. § 2510(1).

In the instant case, it is undisputed that the telephone conversations are "wire communications," as the conversations were made in whole or in part through the use of a facility for the transmission of communications by the aid of wire, cable, or other like connection, namely the office-wide telephone system installed at Best Marketing. In addition, the Court notes that it is not alleged that the office-wide telephone system at Best Marketing was not capable of interstate or foreign communication.[3]

Accordingly, the Court finds that the conversations at issue, which were made over the Best Marketing telephone system, are "wire communications" within the meaning of Title III.

---

[3] It is irrelevant for purposes of this analysis that Hannibal Penney or others used their own personal telephone handsets to plug into any particular extensions of Best Marketing's office-wide telephone system. Here, it is the extensions connected to the mainframe console that constitute the "facilities" for the transmission of communications, and not the particular handsets used over Best Marketing's telephone extensions.

## 2. Were the Telephone Conversations "Intercepted" Within the Meaning of Title III?

Title III defines an "interception" as follows:

> The "aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device."

18 U.S.C. §2510(4). Title III provides some guidance as to what devices may constitute an "electronic, mechanical or other device," and defines such devices as follows:

> [A]ny device or apparatus which can be used to intercept a wire, oral or electronic communication <u>other than</u> ---
>
> > (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communications service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business....

<u>See</u> 18 U.S.C. § 2510(5)(emphasis supplied).

Thus, under the terms of the statute as set forth above, there is no interception, and no Title III violation, if the aural acquisition is through the use of telephone equipment furnished and used in the ordinary course of business. This statutory exception is the "business extension exception," which is well-established in the Eleventh Circuit. <u>See</u> <u>Royal Health Care Serv. Inc. v. Jefferson Pilot Life Ins.</u>, 924 F.2d 215 (11th Cir. 1991); <u>Epps v.</u>

7

St. Mary's Hosp. of Athens, 802 F.2d 412 (11th Cir. 1986); Watkins v. L.M. Berry & Co., 704 F.2d 577 (11th Cir. 1983).

   a. **Were the Conversations Intercepted by Telephone Equipment Furnished in the Ordinary Course of Business?**

To determine if the business extension exception applies, the Court must first consider whether the instrument that "intercepts" is telephone equipment or facility furnished by a communications service provider in the ordinary course of business. The Eleventh Circuit's decision in Epps v. St. Mary's Hospital of Athens, 802 F.2d 412, 416 (11th Cir. 1986) is particularly instructive with regard to the issue of the telephone equipment which "intercepts" conversations within the meaning of Title III. In that case, the hospital installed a recording device to the dispatch console into which emergency calls were made. A separate telephone line, used by employees, was also connected to the dispatch console. Epps, 802 F.2d at 413. Conversations on this separate telephone line were not recorded as a matter of practice. Id. However, while two employees were speaking on that separate telephone line, a third employee recorded them making disparaging remarks about a supervisor on that line. Id., 802 F.2d at 413-414.

Significantly, the Eleventh Circuit rejected the argument that the electronic or mechanical device used for interception was the recording equipment at issue in that case. As the Eleventh Circuit stated, "[w]e believe the intercepting device was the dispatch

console. The console intercepted the call. The double reel recorder recorded it." Epps, 802 F.2d at 415. Thus, the Eleventh Circuit concluded that the dispatch console was a "telephone or telegraph instrument, equipment or facility" within the meaning of the business telephone extension exception, and affirmed summary judgment for the hospital on the Title III claims made by the employees. Similarly, in Royal Health, the Eleventh Circuit rejected the argument that an interception was made by the recording device at issue in that case. As the Eleventh Circuit stated, "[w]e believe the telephone extension intercepted the call, while the tape recorder recorded it." Royal Health, 924 F.2d at 217 (citation omitted).

In the instant case, the device used to intercept the conversations was also the mainframe console, or rather, the telephone extensions connected to the mainframe console. As the testimony of Eckland and Porter indicates, the service observation unit and the Call Logger were each connected to telephone extensions that ran from the mainframe telephone system. Thus, it was the telephone extensions that made possible the interceptions of telephone conversations between Best Marketing employees and others, and not the Call Logger. The Call Logger was the recording

9

device, and not the intercepting device.[4]

Defendants' reliance on Williams v. Poulos, 11 F.3d 271 (1st Cir. 1993) is misplaced. In Poulos, the First Circuit determined that the "device" at issue in that case did not constitute telephone equipment within the meaning of Title III's business telephone exception. In Poulos, the device in question consisted of primitive "alligator clips attached to a microphone cable at one end" and an "interface connecting a microphone cable to a VCR and video camera," mounted on a plywood board on the other end. See Poulos, 11 F.3d at 280. The Court determined that this unusual, make-shift device, which intercepted and recorded conversations, did not constitute telephone equipment within the meaning of Title III's business telephone exception. See id.

However, unlike the situation in Poulos, here the "interceptions" were made possible by the telephone extensions connected to the mainframe console, as part of the telephone system furnished to Best Marketing by Global Communications, Inc., a communications services company, in the ordinary course of its business.

---

[4] The government also maintained that the Call Logger itself constitutes telephone equipment furnished in the ordinary course of business. The testimony of Mr. Porter revealed that the Call Logger is designed for telephone extensions to directly plug into the equipment, and can only be used to record telephone conversations. However, having determined that the Call Logger only records, and does not intercept, the Court need not address this argument.

10

b.  **Was the Telephone Equipment that Intercepted Conversations Used In the Ordinary Course of Business?**

As Title III makes clear, if the communication is "intercepted" by a device being furnished and used in the ordinary course of business, such an interception does not violate Title III.  See also Royal Health, 924 F.2d at 215; Epps, 802 F.2d at 416.

Defendants argue that the recordings were not made in the ordinary course of business because there was no policy of recording calls at Best Marketing, and because Defendants Penney and Dudley did not know that their calls were being recorded. Defendants further argue that the telephone extension exception implicitly contains a knowledge or consent requirement.

However, in the Eleventh Circuit, the business extension exception does not contain any notice or consent requirement.  For instance, in Epps, the recorded conversations fell within the telephone extension exception, even though the hospital did not have a policy of recording employee-to-employee calls and the employees who were making disparaging remarks about a supervisor were not aware that their conversation was being recorded.  Epps, 802 F.2d at 416.  In addition, even though the conversation at issue in Epps revealed the employees' personal opinions about their supervisor, the Eleventh Circuit found the conversations sufficiently business-related, because the conversations did not involve personal calls, occurred during office hours, between co-

workers, and concerned remarks about supervisory employees, thereby implicating business issues of employee relations. Epps, 802 F.2d at 417.

Here, the Defendants have not pointed to specific conversations which they claim violate Title III. Defendants submit that because Ed Hexter is deceased, it is impossible to determine his business reasons for recording employee conversations. However, the testimony of several witnesses, including David Hexter, Ed Hexter's son, who also worked at Best Marketing, and Mark Goldberg, a former telephone salesperson at Best Marketing, indicates that Ed Hexter intercepted telephone calls to train and supervise employees, and to suggest modifications to sales pitches.

After careful review of the evidence in the record and the relevant case law, the Court finds that the recorded interceptions by Ed Hexter of conversations between Defendants and customers or potential customers of Best Marketing, or between co-employees of Best Marketing, made during office hours, over the telephone system at Best Marketing, concerning issues relating to the business of Best Marketing, were interceptions made in the "ordinary course of business." Thus, Ed Hexter's recordings fall under the business extension exception and do not violate Title III.[5]

---

[5] In view of the Court's ruling that Ed Hexter's recordings fall within the business extension exception and thus do not violate Title III, the Court need not address the government's

### III. CONCLUSION

Based on the foregoing, the Court concludes that Title III does not serve to bar the government from introducing Ed Hexter's recordings at trial. Therefore, it is

**ORDERED AND ADJUDGED** that Defendants' Second Motion in Limine (D.E. 110) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 23rd day of April, 2002.

_____
DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: Annie Martinez, AUSA
    Albert Levin, Esq.
    William M. Norris, Esq.

---

argument that Defendant Dudley consented to the recordings, or that the recordings are admissible under a "clean hands" exception.